Evan Fried
David Slarskey
Richard Weingarten
Allyesha Hall
**SLARSKEY LLC**
767 Third Avenue, 14th[th] Floor
New York, NY 1017017
Phone: (212) 658-0661
Email: efried@slarskey.com
      dslarskey@slarskey.com
      rweingarten@slarskey.com
      ahall@slarskey.com
*Counsel for Shahid Buttar et al.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ELITE LIMOUSINE PLUS, INC., et al., | : | Case No. 1-23-43088 (JMM) |
| | : | Jointly Administered |
| Debtors.[1] | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**LIMITED OBJECTION AND RESERVATION OF RIGHTS
OF SHAHID BUTTAR ET AL. TO THE DEBTORS' MOTION
SEEKING ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND FED. R. BANKR. P. 2002, 4001
AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN POSSESSION
TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS AND
SUPERPRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED LENDER, (IV) MODIFYING AUTOMATIC STAY;
<u>(V) SCHEDULING FINAL HEARING AND (VI) GRANTING RELATED RELIEF</u>**

Shahid Buttar, Stefan Berniczky, Haroon Rashid, and Jose Rodriguez (collectively, the "<u>Class Representatives</u>"), by and through their undersigned counsel, submit this limited objection and reservation of rights (the "<u>Objection</u>") to the *Debtors' Motion Seeking Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Fed.*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: Elite Limousine Plus, Inc. (3908) and Dispatch Support Services LLC (2027).

*R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Granting Adequate Protection to Prepetition Secured Lender, (IV) Modifying Automatic Stay; (V) Scheduling Final Hearing and (VI) Granting Related Relief* (the "DIP Motion"). [ECF No. 26]. In support of this Objection, the Class Representatives respectfully state as follows:

## PRELIMINARY STATEMENT

1. On August 29, 2023, Elite Limousine Plus, Inc. ("Elite") and Dispatch Support Services LLC ("Dispatch") (collectively, the "Debtors") each filed voluntary petitions under chapter 11 of title 11 of the United States Code with the Court. As of September 13, 2023, the chapter 11 cases of Elite and Dispatch are jointly administered. [ECF No. 31.]

2. On September 11, 2023, the Debtors filed the DIP Motion. [ECF No. 26.] In the DIP Motion, Debtors seek an order (a) authorizing the Debtors to obtain post-petition financing ("DIP Financing") from Rosenthal & Rosenthal, Inc. ("Rosenthal" or the "Lender"), (b) granting liens and super-priority claims, (c) granting adequate protection to the Lender, (d) modifying the automatic stay, (e) scheduling a final hearing, and (f) granting related relief.

3. On September 15, 2023, the Court entered the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Granting Adequate Protection to Prepetition Secured Lender, (IV) Modifying Automatic Stay; (V) Scheduling Final Hearing and (VI) Granting Related Relief* (the "Interim Order"). [ECF No. 36.]

4. This objection is made by the Class Representatives in *Buttar v. Elite Limousine Plus, Inc.*, Index No. 651088/2019 (Sup. Ct. N.Y. Cty.)—a class action pending before the Hon. Melissa Crane in the Supreme Court of New York, Commercial Division (the "FCS-Elite Litigation"). The Class Representatives include a subset of past and present drivers for Elite.

5. In light of Debtors' deficient filings of financial disclosures and lists of creditors in this action, the Office of the U.S. Trustee (the "UST") recently extended the deadline for applications to a Creditors' Committee to October 20, 2023. The Class Representatives have applied to serve on a Creditors' Committee, and are working to identify other creditors, including other drivers who are not part of the FCS-Elite Litigation and share similar concerns. Drivers are the backbone of Elite and the most vulnerable group of creditors. The Debtors and the Lender could well steamroll drivers' rights. Any power of such a hypothetical Creditors' Committee would be rendered perfunctory if the DIP Financing were permitted to proceed as-is. At a minimum, the Court should grant an adjournment of approval of the DIP Financing until a Creditors' Committee is created.

6. Moreover, on October 2, 2023 the UST presided over an initial meeting of the creditors (the "341 Meeting"). At the 341 Meeting, the Debtors, through its President Shafquat Chaudhary ("Chaudhary"), testified that the Debtors have a myriad of assets by which it could recoup or obtain contribution to satisfy all its outstanding liabilities. Those assets include (a) over $18 million of loans receivable due from entities owned by Chaudhary, (b) liens in favor of Rosenthal from Chaudhary's real estate companies, including Elite R.E. Corp. ("Elite R.E."), which owns the valuable property from which the Debtors operate, (c) a personal guarantee by Chaudhary to the Lender, and (d) numerous claims for Chaudhary's

3

personal liabilities and monies transferred to Chaudhary's affiliates. All creditors have an interest in ensuring that Chaudhary and his affiliates contribute to the satisfaction of all creditors.

7. The Class Representatives are filing the present Objection to (a) protect the financial interest of drivers whose rights are being jeopardized through the DIP Financing, (b) protect the interests of a hypothetical Creditors' Committee, until such a committee can be formed, (c) carve out ample resources for the Debtors to recoup the value of its liabilities from Chaudhary and his obligations to Elite in an effort to maximize creditors' recoveries, and (d) preserve options against the Lender, which appears to have unique insight into Debtors' mismanagement of funds.

## BACKGROUND

### A. Elite and the FCS-Elite Litigation

8. Elite is a black car dispatching company that operates on a franchisor-franchisee model. (*See* FCS-Elite Litigation, ECF No. 581 (Statement of Material Facts).) Drivers obtain "franchises" from Elite, which entitles drivers to receive rides from the Elite dispatch system and be compensated for those rides. A franchise has value, *i.e.,* drivers can buy or sell franchises to/from other drivers.

9. The Class Representatives were originally franchisees with First Corporate Sedans, Inc. ("FCS"), another black car company. The Class Representatives, and most of the FCS and Elite fleets, consist mostly of immigrants from South Asia, Eastern Europe, or Latin America. Elite has other drivers, not part of the FCS-Elite Litigation, who do not come from FCS.

10. Rosenthal (the now-lender to Elite) was originally a lender to FCS.

11. Between 2012 and 2017, FCS's principals, Guy and Amir Ben Zion (the "Ben Zions"), siphoned approximately $6.8 million out of FCS, accumulated multi-million dollar liabilities in unpaid sales tax liability to New York State and the New York Black Car Injury Fund, and a substantial liability to Rosenthal, for which the Ben Zion's were personally liable.

12. In May 2017, FCS sold substantially all its assets to Elite (the "FCS-Elite Transaction"). FCS and the Ben Zions were relieved of their financial obligations to Rosenthal.

13. Elite took on financing from Rosenthal (the financing that is now the subject of Rosenthal's claim in this action). As discussed below, Elite, Chaudhary, and Chaudhary's other entities provided financial guarantees to Rosenthal.

14. The FCS-Elite Transaction rendered Class Representatives' franchises, built through years of dedication and financial contributions, worthless.

15. Elite pursued the FCS-Elite Transaction to capture FCS's client base. Leading up to the transaction, FCS's client base and revenues were growing and it was profitable (even though it hemorrhaged cash to Rosenthal), but Elite's clients and revenues were declining. Thus, Elite saw the opportunity to capture FCS's client base as a strategy to buttress revenues and profits, using its existing technology and driver base.

16. Elite did not need FCS's drivers, and, indeed, already had issues satisfying its existing fleet, which had seen jobs wane over the preceding years. Elite thus nominally offered an Elite franchise to ex-FCS drivers, but, in practice, used them as excess workforce and/or attempted to constructively discharge them from the fleet. Elite subjected them to a long list of horrific behavior intended to freeze them out of the business, including:

5

- Failing to pay drivers, including issuing $1 gross paychecks for weeks' of work. Elite owes voucher payments to drivers.

- Diverting the best work to the nephews of Chaudhary (who are also Elite employees), including 100% manually-overridden jobs to the preferred drivers, leaving ex-FCS drivers without good work.

- Causing ex-FCS drivers a 66% attrition rate, multiples of existing Elite drivers.

- Converting millions of dollars of drivers' savings accounts, security deposits, and "Drivers' Death Fund" benefits, including refusing to repay monies to drivers and their families (as further discussed below).

- Threatening drivers, including Chaudhary's threat to "kill" drivers and to inflict fines in a manner akin to "Saudi Arabia." (*See* FCS-Elite Litigation, ECF No. 581 ¶ 107.) [2]

17. Despite offering ex-FCS drivers Elite franchises, and charging them fees, discussed below, Elite did not issue a "franchise disclosure document" ("FDD"). Franchisors, like Elite, are required by law to issue an FDD to apprise drivers of the terms and risk of obtaining a franchise. Nor did Elite issue franchise contracts or independent contractor documentation to drivers, as mandated under the law. Elite's and Chaudhary's failure to do so is a *per se* violation of New York's Franchise Sales Act ("FSA"), N.Y. GBL §§ 683 and 687. The penalties are strict and include full disgorgement of the millions of dollars Elite has collected as "fees" from drivers, discussed below. Under the law, Chaudhary is personally liable.

18. In 2019, the Class Representatives commenced the FCS-Elite Litigation, asserting claims against FCS, the Ben Zions, Elite, and Chaudhary. The Class Representative asserted, against Elite and Shafquat, claims under the FSA, New York City's Freelance Isn't Free Act ("FIFA"), and in common law.

19. The Court certified a class of approximately 172 drivers (the "Class").

---

[2] "You do something wrong, drugs, you end up in jail for the rest of your life and you get killed. You steal, they cut your hands."

20. In November 2022, the Class moved for affirmative summary judgment against Elite and Chaudhary for claims under the FSA and FIFA. (FCS-Elite Litigation, ECF No. 581.)

21. On April 28, 2023, the Court held oral argument on that motion, which is *sub judice*. (ECF No. 860.) Four months later, Elite and Dispatch filed this action.

**B. The Elite Payment Structure**

22. As noted above, Elite operates on a franchisor-franchisee model with drivers.

23. More specifically, Elite generates clients for its drivers, which are dispatched to drivers. For example, Elite may charge XYZ law firm $100 for a ride and dispatch that ride to a driver. The Elite driver receives a $100 "voucher" (now, an electronic voucher) entitling the driver to compensation for that ride. Elite's policies and practices, and the law, are unclear as to whether the "client" is technically a client of *Elite*, or of *the driver*.

24. To maintain a franchise and receive jobs, drivers pay fees and funds to Elite. Those fees and funds include the following:

- Upfront/Initial Fees: Drivers are obligated to pay an initial fee upwards of $20,000 to the franchisor, which is paid in installments and deducted from monies otherwise due to the driver. For example, Mr. Buttar, who was still in the process of paying off his franchise as of the FCS-Elite Transaction, had $500 per month deducted by Elite from monies that he otherwise would have earned.

- Subscription Fees: Drivers pay weekly subscription fees to Elite (hundreds of dollars).

- Voucher Commission/Royalties: Drivers pay Elite a "Voucher Commission" or "Payment Discount," *i.e.,* the "percentage per voucher" "royalty" 20-24%. The driver retains the remaining 76-80%. Elite has increased the "Voucher Commission" to Elite between 2017 and present—at Elite's sole discretion.

- Additional Customer Discount: Drivers pay Elite an "Additional Customer Discount," up to 17%.

7

- Undisclosed Miscellaneous Fees: Drivers pay Elite other "fees," including an undisclosed, mandatory Drivers' Death Fund fee of $2 per week, discussed below.

25. To effectuate the voucher/fee structure, the driver is given a "voucher" (previously a physical voucher and currently an electronic voucher) for payment (through Elite's computer system). Elite then collects its fees by deducting those amounts from the voucher. Elite then remits the remainder of the voucher to the driver.

26. Elite constantly changes the fees and deduction policies in a predatory manner to ensure that Elite is profitable (and to bridge its obligations to its lender) and obfuscate drivers. Ex-FCS drivers worked for days or weeks, but Elite's fees and deduction policies were so oppressive that drivers were left without compensation *at all*. This is a subject of the FCS-Elite Litigation.

27. Elite is required, by law, to collect certain charges from customers and immediately remit those funds to third-parties:

- New York Black Car Injury Fund: Elite is required to charge a percentage fee to customers, which is paid to the New York Black Car Injury Fund (the "NYBCIF"). The NYBCIF provides mandatory workers' compensation-like protection to drivers. This amount is a pass-through, such that it is inexplicable that Elite has failed to pay those monies.
- New York State Sales Tax: Elite collects sales tax from clients on each voucher. Elite has converted those monies by failing to make payments to the authorities.

28. Likewise, Elite operates "funds" ostensibly for the benefit of drivers, also deducted from drivers' pay. Three such "funds" are noteworthy:

- Long Term Savings Plan (aka "Voucher Savings Plan"): Elite purports to operate "savings plans," whereby drivers hold back monies with Elite. As part of the FCS-Elite Transaction, Elite contractually assumed the liability of ex-FCS drivers' savings monies. Additionally drivers, like Mr. Buttar, invested new monies into the Elite savings plan.
- Security Deposits: FCS drivers were obligated to keep security deposits with FCS. As part of the FCS-Elite Transaction, Elite assumed the liability of ex-FCS drivers'

8

security deposits. Drivers, like Mr. Rashid, demanded refund of security deposits upon the FCS-Elite Transaction, but were denied.

- Drivers' Death Fund: Elite collects a mandatory weekly fee (a "premium") from drivers for a fraudulent "Drivers Death Fund." The fund was mandatory until Elite canceled it. The program operates like life insurance—*i.e.,* when a driver dies, Elite is supposed to pay $15,000-30,000 to the family of deceased drivers. Drivers, like ex-FCS drivers Rueben Ohayon and Dov Fischer, died while working for Elite, and Elite has refused to pay the families of the drivers.

29. These too are under scrutiny in the FCS-Elite Litigation. Elite misrepresented the nature of the funds and engaged in gross financial impropriety with respect to maintaining such funds.

30. As discussed above, Elite did not issue an "FDD" or a franchise agreement to drivers, which would have clarified Elite's policies (or rather lack thereof) with respect to these funds. Instead, Elite and Chaudhary obfuscated the nature of the FCS-Elite Transaction to drivers and gave them false comfort as to ex-FCS drivers' future. Specifically, Elite did not, at ex-FCS drivers' initial meeting with Elite or otherwise, disclose that Elite (a) discontinued collections for a Long Term Savings Plan, (b) did not have a security deposit requirement, and (c) charged drivers for the mandatory Drivers' Death Fund fees.

31. Elite has admitted that it does not maintain separate accounts for any of these supposed "funds," does not invest drivers' monies or provide drivers interest on their monies, and actually commingles drivers' funds with cash. (FCS-Elite Litigation, ECF No. 581 ¶ 91-93 ("They are commingled. They are not segregated").) Elite has routinely failed to pay out drivers from these supposed funds, including failing to pay Drivers' Death Fund benefits to families of deceased drivers. (*Id.* ¶ 98-103.)

32. Likewise, franchises may be bought, sold, and, under certain circumstances, sold back to Elite through a put-back right of drivers. These are bargained-for

9

rights pursuant to franchisee-franchisor relationship. Elite has denied drivers the right to sell their franchises.

33. On April 28, 2023, the New York Supreme Court heard oral argument on the parties' competing summary judgment motions. (FCS-Elite Litigation, ECF No. 806.) The Court took particular interest in Elite's failure to pay from the "funds" and Elite's ability to pay out the funds. (*Id.* at 65:13-22.)

34. Those motions were *sub judice* when Elite filed this action.

**C. The Debtors' Financial Disclosures, Creditors' Lists, Applications for a Creditors' Committee, and the 341 Meeting in the Present Action**

35. The Debtors have made deficient filings to the Court to-date. More specifically, the Debtors' initial matrix of creditors did not list all the creditors, and weeks later, the Debtors were forced to submit a complete matrix. Additionally, the Debtors have failed to provide financial disclosures.

36. Due to these deficiencies, the UST extended the date for creditors to apply to be appointed to a Creditors' Committee to October 20, 2023. The Class Representatives along with other Elite drivers, have applied to be on the Creditors Committee.

37. On September 26, 2023, just days before the 341 Meeting, the Debtors filed the Declaration Under Penalty of Perjury for Non-Individual Debtors, listing Debtors' assets and liabilities [ECF No. 42]. The Debtors list the Class's claim at $3 million (the second largest claim, second to Rosenthal). Elite also lists a host of other drivers as creditors, including for "Driver deposits." (ECF No. 42, §§ 3.3-3.70].

38. Elite lists as "other assets" a number of loans receivable from entities affiliated with Elite and Chaudhary, including a (a) $11.271 million loan receivable from Elite

R.E. Corp. ("Elite R.E."), and (ii) $6.018 million loan receivable from Soundview Broadcasting ("Soundview"), a technology firm also owned by Chaudhary.

39. On October 2, 2023, the UST, presided over the 341 Meeting. We are not in possession of the audio transcript of the meeting. Elite, through Chaudhary, testified *inter alia*, as follows:

40. The Rosenthal Lockbox. Elite testified that all of Elite's revenues, *i.e.,* monies collected from clients, flows first to a "lockbox" account controlled by Rosenthal. That includes all of the "funds" contributions drivers pay, NYBCIF and Sales Tax monies, and other monies, discussed above. Elite testified that it operates on a "zero cash basis," *i.e.,* it maintains little cash in its operating account and effectively draws monies from Rosenthal to then pay its operating costs.

41. NYBCIF Monies and Sales Tax. Chaudhary affirmed that each voucher to customers includes charges for the NYBIF and Sales Tax. Those monies are collected and flow to the Rosenthal lockbox. Notwithstanding Elite's collection of those monies, Elite has not paid those monies to NYBCIF or Sales Tax authorities.

42. Drivers' Funds. Elite collects from drivers monies for the "funds" discussed above. Elite, at times, had a liability in excess of $4 million to drivers for the Long Term Savings Plan, because it collected those amounts. Currently, Elite owes drivers in excess of $1 million under the Long Term Savings Plan. Chaudhary communicated to Rosenthal Elite's and Chaudhary's efforts to "slow down" the repayment to drivers. Elite confirmed that it has not paid the families of drivers for Drivers' Death Fund benefits.

43. Elite's Ability to Pledge Drivers Funds as a Lien to Rosenthal. The UST inquired whether Elite could subject funds, *e.g.,* drivers' funds, the percentage of monies

11

of a voucher due to a driver, etc., to a Rosenthal security interest (through the DIP Financing, or otherwise). Chaudhary was unaware, as a legal matter, of whether this was legally permissible. It is unclear if Elite has sought legal advice on this issue.

44. Elite R.E. Corp. Elite's financial disclosures indicate a $11.271 million "Loan Receivable from Affiliate - Elite R.E. Corp." to Elite. [ECF No.. 42 at 6-7]. Elite R.E. is the real estate holding company owned by Chaudhary, which owns the property at 32-72 Gale Avenue, Long Island City, New York (the "Gale Avenue Property"). Separately, Elite R.E. pledged its assets as additional security to Rosenthal in 2017, and that pledge is still in effect. The loan receivable represents monies extended from Elite to Elite R.E. for improvements to Elite R.E. Although Elite and a handful of other Chaudhary-owned entities operate through the Gale Avenue Property, only Elite pays rent to Elite R.E.

45. On information and belief, the Gale Avenue Property is worth tens of millions of dollars. Chaudhary testified that Gale Avenue Property is now up for sale and that he expects that, if the property is sold, those monies would be used to either satisfy Rosenthal or Elite—in either event, for the benefit of Debtors. The Class Representatives have been unable to identify any public listing of the Gale Avenue Property.

46. Chaudhary testified there are several properties also pledged for the benefit of Rosenthal, and also up for sale, which would alleviate the Debtors' liabilities to Rosenthal.

47. Personal Guarantee. Chaudhary testified that, in 2017, he entered into a written personal guarantee to Rosenthal, and that such personal guarantee is still in effect.

48. <u>Personal Liability.</u> Chaudhary faces potential personal liability for a number of the Debtors' debts, including for claims brought by the Class under the FSA, and claims for New York Sales Tax.

49. <u>Soundview.</u> Elite also has a $6.018 million loan receivable from Soundview. [ECF No. 42 at 6-7].

50. <u>Elite Coach.</u> Elite has a $476,874 loan receivable from Elite Coach, a non-Debtor entity which operates a bus and limousine service and owns a fleet of luxury cars. [ECF Not. 42 at 6-7.]

51. <u>Chaudhary and Affiliate Payments.</u> Chaudhary testified that Elite has made payments to non-Debtor persons or entities affiliated with Chaudhary, including his daughter and Royal Dispatching LLC, an entity his daughter controls. Chaudhary has received a salary from Elite, and Elite has paid his personal expenses. These payments are not clearly outlined in Debtors' disclosures. [ECF No. 42.] Based on Chaudhary's representations to the UST's questions,it is unclear whether the Debtors' disclosures were complete. [ECF No. 42].

## **ARGUMENT**

### I. **Final Approval of the DIP Motion is Premature Because a Creditors' Committee Has Not Been Formed.**

52. The Debtors and Lender are seeking approval of DIP Financing before the creation of a creditors' committee (including the deadline to submit applications). The delay in the creation of a creditors' committee is in large part caused by the Debtors' failure to provide a creditors' matrix and required financial disclosures.

53. It is apparent, however, that the creditors of the Debtors include hundreds of diffuse drivers. Though each of these drivers has relatively modest claims, they are collectively the largest group of creditors (alongside Rosenthal). Each driver has invested

thousands, or tens of thousands, of dollars into an Elite franchise, and each could greatly benefit from the creation of a creditors' committee to protect their interests.

54. The Debtors and Lender have attempted to expedite the relief to Rosenthal, and presumably the protections to the Debtors, Chaudhary, and Chaudhary's affiliates, through an expedited approval of a final DIP Financing Order. Drivers' rights are particularly at risk in light of the aggressive, activist approach taken by the Debtors and Lender to expedite terms favorable to the Lender but prejudicial to the remaining creditors.

55. Because no creditors' committee has been formed, a potential creditors' committee has not had the opportunity to review, let alone challenge, the DIP Financing. Nor has any party, especially in light of the belated disclosure in this action, had an opportunity to thoroughly vet the financial disclosures or the implications of Debtors' testimony from the 341 Meeting.

56. At a minimum, the DIP Financing should not be approved on a final basis until a creditors' committee is formed and can weigh in on these issues.

## II. The DIP Financing Should Include a Sufficient Carveout to Support Efforts to Protect the Interests of Creditors and Maximize Recoveries.

57. It is apparent, based on the Debtors' financial disclosures and testimony at the 341 Meeting, that multiple assets and/or sources of funds are available and could be used to satisfy the Debtors' obligations to their creditors, including Rosenthal. Pertinently, these assets may, based on the 341 Meeting, include assets which the Debtors did not amply disclose.

58. Specifically, the Debtors have available: (a) a loan receivable to Elite and pledge in favor of the Lender with respect to the Gale Avenue Property owned by Elite R.E. Corp., worth at least $11.271 million, (b) a personal guarantee by Chaudhary in favor of

14

the Lender, (c) additional pledges to the Lender with respect to additional real property, (d) a myriad of claims with respect to funds remitted to affiliates of Chaudhary, including family members, Elite Coach among others, and (e) personal liability against Chaudhary with respect to some of the claims. The assets are nominally sufficient to satisfy all creditors.

59. It is in the best interest of the Debtors' estate for the Debtors to pursue those claims so as to generate additional funds to maximize creditors' recoveries, including that of the Lender.

60. As such, the proposed DIP Financing does not create an ample carve-out for administrative fees or for fees for counsel for a putative creditors committee [ECF No. 26-2 § 2.3]. Any DIP Financing should include adequate resources for appointment of competent counsel to represent the creditors' committee and ample professionals to investigate Chaudhary's and his affiliates' secretion of assets from the Debtors.

### III. The Debtors Cannot Provide, and Rosenthal Cannot Receive, a Security Interest on all Monies in the Lockbox.

61. At the 341 Meeting, the UST raised questions as to whether, and to what extent, Elite, *i.e.,* a *franchisor* that merely serves as a payment processor for drivers, has the ability to subject monies due and owing to its *franchisees*, who are non-obligors to a lender (namely Rosenthal), to a lien.

62. Elite's position, and the position presupposed by the DIP Motion, appears to be that Elite exercises full right and title to revenues from customers and can offer that as security to Rosenthal. However, this relies on a fundamental misapprehension of franchisor-franchisee relationships.

63. In a franchisee-franchisor relationship, the *franchisee* is the vendor to end-customer, and the driver-franchisees *pay to Elite* a royalty, *i.e.,* the "fees," described

15

above. The driver collects a voucher, Elite processes the voucher, Elite deducts its fees, and the driver owns the remainder.

64. Using the analogy of a fast-food chain, the franchisee (the local McDonalds) collects the monies for selling hamburgers and pays a royalty (*i.e.,* a percentage of each hamburger) to the *franchisor* (McDonald's corporate). Here, the driver sells the ride, resulting in a voucher to the driver; the driver pays Elite a fraction of that voucher in the form of the fees discussed above; and the remainder of that voucher belongs to the driver. In both instances, the majority of the payment (the hamburger or voucher) belongs to the franchisee.

65. The fact that Elite collects the monies, through the Rosenthal lockbox, does not alter that result. Elite is merely serving as a payment processor for the benefit of drivers. The monies that Elite collects, held in the Rosenthal lockbox account, are merely held for the drivers' benefit and to provide Elite the opportunity to deduct its royalties/fees. However, this is still—at its core—a franchisor-franchisee relationship meaning the voucher belongs to the driver.

66. This fact becomes even clearer with respect to other monies collected from customers. Elite collects the NYBCIF and Sales Tax premiums from customers. Those monies do not belong to Elite or Rosenthal, but rather must, as a matter of law, be paid over to the NYBCIF and the New York State Sales Tax authorities. Indeed, Elite's failure to this, resulting in substantial liabilities to these entities, is astounding.

67. Similarly, the "funds" into which the drivers paid are held in trust *for the drivers.* But Elite is attempting to provide, and Rosenthal is attempting to achieve, a security interest of drivers' Drivers' Death Fund premiums, Long Term Savings Plans, and security deposits.

16

68. The proposed DIP Financing would effectively validate Rosenthal's security interest on monies Elite currently controls, because of the flow of funds, but which are merely being processed for the benefit of drivers. To do so would be very prejudicial to drivers, especially in light of their inability, thus far, to properly challenge those acts, through a creditors' committee.

69. At a minimum, the UST has indicated concern for Elite's (and Rosenthal's) purported ability to place a security interest on all the proceeds. No final DIP Financing should be approved until the parties, including a putative creditors' committee with the objective of protecting interests of hundreds of drivers, have had the opportunity to take discovery on and fully brief the issues.

**IV.     The Creditors Require the Opportunity to Challenge Rosenthal's Claim.**

70. Finally, the DIP Motion purports to ratify the terms of Rosenthal's pre-petition lien and potentially the amount of Rosenthal's claim [*See* ECF No. 26-2 § 1.3(a)].

71. However, Rosenthal was previously a lender to FCS and later became a lender to Elite. In that capacity, Rosenthal maintains a lockbox account through which all Elite revenue, including monies paid by or held back for the benefit of drivers, flowed. Rosenthal has thus had access to records and communicated with the Debtors concerning the monies collected from drivers and Elite's obligations with respect to those monies. And given Rosenthal's long history lending to black car companies, including through the turmoil at FCS, it is reasonably inferable that it has a firm understanding of obligations to drivers.

72. On information and belief, Rosenthal was aware of Elite's obligation to hold monies, including the "funds" discussed above, for the benefit of drivers, and Elite's

17

failure to do so. Likewise, on information and belief, Rosenthal was aware of Elite's obligation to pay NYBCIF payments and New York Sales Tax, and its failure to do so.

73. All creditors in addition to Rosenthal, and more specifically the driver-franchisees, require the opportunity to request additional information from Elite and Rosenthal to confirm the Debtors' obligations and Rosenthal's claim, and whether the non-Rosenthal creditors have a basis to challenge Rosenthal's lien.

74. Likewise, whereas Elite has systematically denied drivers, and other creditors, compensation, Elite has remitted Rosenthal millions of dollars since 2017. The other creditors deserve a complete reconciliation of those funds prior to Rosenthal's attempt to swallow up a substantial additional portion of claims against the Debtors.

75. The DIP Financing should be rejected to the extent that it purports to render Rosenthal's debts insusceptible to challenge.

## **RESERVATION OF RIGHTS**

76. The Class Representatives hereby reserve the right to amend, modify or supplement this Objection.

**WHEREFORE**, the Class Representatives respectfully request that the Court defer consideration of the DIP Motion until after a creditors' committee is formed or deny the DIP Motion.

[remainder of page intentionally blank]

Dated: New York, NY
      October 6, 2022

Respectfully Submitted,


\_\_//s// Evan Fried_____
Evan Fried
David Slarskey
Richard Weingarten
Allyesha Hall
**SLARSKEY LLC**
767 Third Avenue, 14th Floor
New York, NY 10017
Phone: (212) 658-0661
Email: efried@slarskey.com
       dslarskey@slarskey.com
       rweingarten@slarskey.com
       ahall@slarskey.com
*Counsel for Shahid Buttar et al.*