UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
In re                                                   :
                                                        :    Chapter 11
Elite Limousine Plus, Inc. et al.,                      :
                                                        :    Case No. 23-43088-jmm
                         Debtors.                       :
                                                        :
------------------------------------------------------- x

**LIMITED OBJECTION OF UNITED STATES TRUSTEE TO DEBTORS'
MOTION TO OBTAIN DEBTOR-IN-POSSESSION FINANCING**

William K. Harrington, the United States Trustee for Region 2 (the "U.S. Trustee"), by and through his undersigned counsel, hereby respectfully submits this limited objection (the "Objection") to the motion (EFC no. 26, the "DIP Financing Motion") filed by Elite Limousine Plus, Inc. ("Elite") and Dispatch Support Services LLC ("Dispatch" and together with Elite, the "Debtors") in the above-captioned jointly administered chapter 11 cases (the "Bankruptcy Cases") for authority to, among other things, obtain post-petition financing from their prepetition secured lender, Rosenthal & Rosenthal, Inc. ("Rosenthal"). In support of the Objection, the U.S. Trustee respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.  The Debtors are seeking authority to ratify an amended prepetition credit facility (the "Credit Facility") under which Rosenthal would continue to lend up to 85% of the face amount of the Debtors' receivables on a revolving basis. When the receivables are collected by the Debtors, 100% would be applied to pay down their pre-petition debt to Rosenthal (rather than their post-petition borrowings). The accumulating post-petition debt resulting from this arrangement would be secured by liens on the Debtors' post-petition receivables, thus effectively

converting Rosenthal's prepetition debt into post-petition debt secured by property acquired after the commencement of these Bankruptcy Cases (the "Roll Up"). In addition, a portion of 85% borrowed by the Debtors—$76,000 per month—would be paid to Rosental as "adequate protection" for using Rosenthal's cash collateral to pay-down Rosenthal's prepetition debt (the "AP Payments"). The DIP Financing Motion also seeks authority for the Debtors to continue to use certain prepetition lock box accounts in which, on information and belief, their receivables are comingled with the receivables of a non-debtor third-party black car company (the "Cash Management System").

2. The United States Trustee respectfully submits that final approval of the Motion should be adjourned for approximately forty-five (45) days so that a creditors' committee, if one is formed, has an appropriate opportunity to challenge not just the amount and security of the Rosenthal's claims but also other key aspects of the relief sought in the Motion, including the Rollup and AP Payments. Because the Debtors did not file their schedules and lists of top 20 unsecured creditors until September 27, 2023—a month after the petition date—the U.S. Trustee only recently mailed additional creditors' committee formation letters. Several creditors have already expressed interest in serving on a committee and the U.S. Trustee expects that, after the response deadline has passed, a creditors' committee will likely be formed.

3. The United States Trustee also respectfully submits that final approval of the DIP Financing Motion should be adjourned because the motion and supporting affidavits, including the local rule 1007-4 affidavit cross-referenced in the motion (ECF no. 4, the "First Day Affidavit"), fail to sufficiently disclose information relevant to the appropriateness of various forms of relief sought in the motion. The U.S. Trustee submits that the Debtors should be

required to disclose all information that bears on the relief sought in the DIP Financing Motion by no later than two (2) weeks prior to the final hearing.

4. Finally, the United States Trustee submits that the Cash Management System components of the Debtor's proposed DIP financing order should be denied because they would result in an inappropriate comingling of debtor and non-debtor funds and liabilities.

## BACKGROUND

5. This "Background" section reflects the U.S. Trustee's understanding of information disclosed by the Debtors at the section 341 meeting of creditors (conducted on October 2, 2023) that was largely not disclosed by the Debtors in the DIP Financing Motion, supporting affidavit or First Day Affidavit. This Background section is not submitted as factual evidence *per se*, but rather to highlight categories of information that are relevant to the relief sought in the Motion that have not been sufficiently disclosed by the Debtors in their filings to date:

**Black Car Base Business.**

6. On information and belief, under applicable laws and regulations, "Black Car Base" companies are licensed by New York City to (i) dispatch "Black Car Vehicles" to passengers on a pre-arranged basis, and (ii) collect payment from the passengers after a ride.[1] The Black Car Vehicles are owned by their drivers. Unlike taxicab or rideshare drivers, Black Car drivers are not independent contractors or employees of Black Car Base companies. Rather, a Black Car Base and each driver have a contractual franchisor / franchisee relationship (a

---

[1] *See* TLC Rules, **Chapter 59-For Hire Service**, available at: https://www.nyc.gov/assets/tlc/downloads/pdf/rule_book_current_chapter_59.pdf

"Francise Contract") that is subject to New York State franchise regulations and the oversight of the New York State Attorney General.

7. On information and belief, after a Black Car Vehicle is dispatched by a Black Car Base and a ride is provided by the driver of the Black Car Vehicle, the passenger is issued a "voucher" (invoice) that is paid by the passenger or its employer to the Black Car Base. Vouchers includes applicable sale taxes, port authority fees, and a fee for the Black Car Fund (collectively, the "Trust Funds") plus the fare for the ride, any tolls paid by the driver, and any tip for the driver (collectively, the "Fare"). After receiving payment of a voucher, the Black Car Base is required to turnover the Trust Funds and pay the Fare to the driver—less a per-voucher fee and a percentage "commission" that is charged by the Black Car Base as franchisor under its Franchise Contract with the driver (the "Franchise Fees").

8. On information and belief, in addition to paying the Franchise Fees collected from each Fare, Black Car Vehicle drivers historically have paid upfront fees to Black Car Bases for the right to enter-into a Franchise Contract with the base, which contract fees typically were tens of thousands of dollars. These contract fees are often paid by the Drivers in installments as additional Franchise Fees withdrawn from their Fares.

**Nature of Debtors' Businesses.**

9. On information and belief, Elite is a licensed Black Car Base.

10. On information and belief, Dispatch is not a Black Car Base. Rather, Dispatch has a contract to dispatch cars and collect vouchers for Royal Dispatch Services, Inc., a non-debtor third-party company that holds a Black Car Base license ("Royal Dispatch").

11. On information and belief, Dispatch does not actually provide dispatch or collection services to Royal Dispatch. Rather, it subcontracts to Elite, and Elite provides all

dispatch and collection services for Royal Dispatch and retains a percentage of the net Franchise Fees earned by Royal Dispatch.

12. On information and belief, although Elite and Royal Dispatch are separate legal entities with separate Franchise Contracts, Elite does not distinguish between Elite drivers and Royal Dispatch drivers when dispatching Black Car Vehicles or collecting vouchers.

13. On information and belief, under the Debtors' prepetition cash management system that is currently still in place, Elite deposited and comingled its and Royal Dispatch's receivables—including the Trust Funds, Drivers' Fares, and Savings and Death Funds (defined below) and Francise Fees portions of each voucher—into lock-box accounts (subject to Rosenthal's account control agreements) that are swept by Rosenthal.

14. On information and belief, under the Debtors' prepetition financing agreement with Rosenthal, Elite borrowed against its receivables and those of Royal Dispatch and paid its and Royal Dispatch's operating expenses out of such borrowings.

**First Corporate Sedans Transaction**

15. On information and belief, in 2017, Elite acquired certain assets of another Black Car Base company, First Corporate Sedans, Inc. ("FCS"). Elite did not acquire FCS's base license or receive assignment of its Franchise Contracts. Rather, Elite received FCS's customer lists in exchange for assuming approximately $11 million in debt owed by FCS to Rosenthal (the "Legacy FCS Debt").

16. On information and belief, following the acquisition, Rosenthal began providing receivables-based financing to Elite, and the parties entered-into the Credit Facility.

17. On information and belief, following the acquisition, many of FCS's drivers began to drive for Elite. On information and belief, Elite failed to enter-into Franchise Contracts with many of the former FCS drivers that began to drive for Elite after the acquisition.

**Additional Collateral**

18. On information and belief, in connection with assuming the FCS Legacy Debt and the Credit Facility, the Debtors granted Rosenthal security interests in substantially all their assets.

19. On information and belief, Rosental was also granted, as additional collateral for its claims against the Debtors, security interests in three parcels of real property indirectly owned by the Debtors' owner (the "Additional Collateral").

20. On information and belief, the value of the Additional Collateral may equal or exceed the amount of Rosenthal's claims against the Debtors.

**Debtors' Failure to Segregate Savings and Death Funds**

21. On information and belief, in addition to withholding the Franchise Fees from the fares earned by drivers, the Debtors withheld certain additional amounts, including: (a) funds for a savings plan for the drivers that was managed by the Debtors and into which the Debtors were supposed to make matching contributions and/or pay interest (the "Savings Funds"), and (b) funds for a death benefit plan from which the Debtors were supposed to make a lump-sum payments to the families of deceased drivers (the "Death Funds.")

22. On information and belief, the Debtors failed to segregate the Savings Funds and Death Funds into separate interest-bearing or investment accounts or to make required matching contributions or interest payments. Instead, the Debtors blended the drivers' Savings Funds and Death Funds in the Debtors' general collections accounts that were swept by Rosenthal.

23. On information and belief, a substantial portion of the Debtors' unsecured debt reflects the Debtors' failure to segregate and repay the Savings Funds and Death Funds.

**Class Action**

24. On information and belief, as of the petition date Elite was a defendant in a pending class action lawsuit filed by certain former and current drivers alleging, among other things, that Elite's failure to enter into franchise agreements with FCS's former drivers violated applicable law, requiring disgorgement of all fees collected from such drivers.

**LIMITED OBJECTION**

**I.** **Applicable Law.**

25. Under section 364(c) of the Bankruptcy Code, a court may permit a chapter 11 debtor to obtain post-petition financing "secured by a lien on property of the estate that is not otherwise subject to a lien,"[2] or authorize a debtor to grant super-priority administrative claims in connection with such financing, only if the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense." 11 U.S.C. § 364(c).

26. While bankruptcy courts generally defer to debtors' business judgment when reviewing motions to obtain post-petition financing, proposed financing should nonetheless be denied where it would unfairly "leverage the bankruptcy process" or "cede control of the reorganization to one party in interest." *See In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 Bankr. LEXIS 1917, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (denying debtor's motion for post-petition financing that would have primed other secured creditors and

---

[2] Under sections 552(a) of the Bankruptcy Code, property acquired by a debtor after the commencement of its case "is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." *See* 11 U.S.C § 552.

caused them to bear the risk of the debtor's reorganization); *see also In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 791 (Bankr. S.D.N.Y. 2020) (denying approval of post-petition financing that would have constituted a plan *sub rosa* unfairly advantaging certain of the debtor's prepetition lenders and equity holders). In reviewing debtor-in-possession financing motions, bankruptcy courts in the Second Circuit often consider, among other factors, whether the financing is in the best interests of the estate and its creditors, and whether the terms of the transaction are fair and reasonable "given the circumstances of the debtor-borrower and the proposed lender." *See In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005) (citing *In re Farmland Industries, Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mis. 2003).

27. Under section 105(a) of the Bankruptcy Code, the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

## II. **Limited Objection**.

28. The United States respectfully submits that the Court should adjourn the hearing on final consideration of the DIP Financing Motion for at least forty-five (45) days so that, in the event a creditors' committee is formed, the committee will have a reasonable opportunity to: (i) review and understand the Debtor's financing proposal; (ii) determine if it is in the best interests of creditors, is fair and reasonable given the Debtors' and Rosenthal's circumstances, and otherwise meets the requirements of section 364(c) of the Bankruptcy Code; and (iii) potentially object to various aspects of the Motion and proposed final order.

29. In addition, the U.S. Trustee respectfully submits that the Debtors have failed to disclose pertinent information with respect to the "circumstances of the debtor-borrower and the proposed lender," which information is necessary for the Court and parties-in-interest to

determine if the proposed financing is fair and reasonable. The U.S. Trustee respectfully requests, pursuant to section 105(a) of the Bankruptcy Code, that Court require the Debtor to file an amended Motion and/or supporting affidavits, at least two (2) weeks prior to adjourned hearing on DIP Financing Motion, that discloses all information bearing on the relief sought in the motion.

30. In addition, the U.S. Trustee submits that the Cash Management System components of the Debtor's proposed DIP financing order should be denied because they would result in an inappropriate comingling of debtor and non-debtor funds and liabilities in violation of, among other thing, the requirements of section 345 of the Bankruptcy Code.

**CONCLUSION**

For the reasons set forth in this Objection, the U.S. Trustee respectfully requests that the Court: (i) adjourn the final hearing on the DIP Financing Motion for at least forty-five days; (ii) direct the Debtor to disclose all factual information relevant to the relief sought in the motion no later than two (2) weeks prior to the final hearing; (iii) deny the Cash Management System components of the Debtor's proposed DIP financing order; and (iv) grant such other relief as is just.

Dated: New York, New York
       October 8, 2022

                                  WILLIAM K. HARRINGTON
                                  UNITED STATES TRUSTEE, REGION 2

                            By:   */s/ Jeremy S. Sussman*
                                  Jeremy S. Sussman, Trial Attorney
                                  **U.S. Department of Justice**
                                  **Office of the United States Trustee**
                                  Alexander Hamilton Custom House
                                  One Bowling Green, Room 510
                                  New York, New York 10014