**MORRISON COHEN LLP**
909 Third Avenue, 27th Floor
New York, New York 10022
(212) 735-8600
Joseph T. Moldovan, Esq.
David J. Kozlowski, Esq.
Dawn R. Sudama, Esq.

*Counsel for the Official
Committee of Unsecured Creditors*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re                                                                    :
                                                                         :            Chapter 11
ELITE LIMOUSINE PLUS, INC., *et al.*            :
                                                                         :            Case No.: 23-43088 (JMM)
                                                                         :            Jointly Administered
                                            Debtors.[1]        :
----------------------------------------------------------------X

### THE OFFICIAL COMMITTEE'S
### RENEWED REQUEST FOR SUA SPONTE CONVERSION
### TO CHAPTER 7 AND OBJECTION TO DEBTORS' INTERIM ORDER
### PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R.
### BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTORS AND DEBTORS IN
### POSSESSION TO OBTAIN POSTPETITION FINANCING, (II) GRANTING LIENS
### AND SUPER-PRIORITY CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO
### PREPETITION SECURED LENDERS, (IV) MODIFYING THE AUTOMATIC STAY;
### (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors ("**Committee**") of Elite Limousine Plus,

Inc., *et al*. ("**Debtors**") hereby files this (the "**Objection**") (i) renewal of its request for *sua sponte*

conversion to Chapter 7 and (ii) objection to the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105,*

*361, 362, 363, 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtors*

*and Debtors in Possession to Obtain Postpetition Financing, (II) Granting Liens and Super-*

*Priority Claims, (III) Granting Adequate Protection to Prepetition Secured Lenders,*

---

[1]    The Debtors are Elite Limousine Plus, Inc. ("**Debtor Elite**") (23-43088) and Dispatch Support Services LLC
    ("**Debtor DSS**") (23-43089).

*(IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (Docket No. 210) ("**Replacement DIP Motion**") on an interim basis.[2] In support thereof, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Over a year into this bankruptcy, the Debtors are no closer to being able to file a confirmable plan than they were on the Petition Date. Their primary focus has been to continue operations while obtaining a series of secured loan extensions from its prepetition secured lender (Rosenthal & Rosenthal, Inc.; the "**Initial DIP Lender**"), thereby shielding the Debtors' principal from his guaranty obligations to the Initial DIP Lender, all while incurring significant professional fees well in excess of the budgeted amounts. In this year-long process, the only party to conduct any investigation or attempt to uncover any assets for the benefit of the estates and their creditors has been the Committee.

2.      Now the Debtors come before this Court proposing a replacement DIP loan that ignores most of the objections raised in the Committee's Initial DIP Objection (despite the Committee's explicit statements, while being excluded from the negotiations, that it expected its objections to be addressed), releases the Initial DIP Lender without any examination or analysis, creates new management and reporting requirements for which the Replacement DIP Lender (as defined below) will be compensated from the money it lends, and includes a budget that does not adequately address ever-growing administrative costs.

---

[2]     The Committee notes that despite its objections to the Initial DIP Motion (*The Official Committee of Unsecured Creditors' Request for Sua Sponte Conversion to Chapter 7 and Objection to Debtors' Motion Seeking Entry of Interim And Final Orders Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 and Fed. R. Bankr. P. 2002, 4001 and 9014 (i) Authorizing Debtors and Debtors in Possession to Obtain Postpetition Financing, (ii) Granting Liens And Superpriority Claims, (iii) Granting Adequate Protection to Prepetition Secured Lender, (iv) Modifying Automatic Stay; (v) Scheduling* (Docket No. 146) filed April 1, 2024 ("**Initial DIP Objection**")), many of the objectionable points raised remain unaddressed (or in the case of avoidance action liens, reserved for a final hearing). To the extent relevant, the Committee adopts and incorporates by reference the Initial DIP Objection.

3.      The Committee is again forced to ask—who is this helping? The company is on life support, and there is no indication that the Debtors are, or realistically can be, profitable. Much less can the Debtors claim with a straight face the ability to propose a confirmable plan of reorganization ("**Plan**"). Despite early conversations to the contrary, the Initial DIP Lender apparently has not exercised its non-bankruptcy remedies by enforcing its liens on non-debtor assets and pursuing guarantees of its debt against the Debtors' principal and any other guarantors. In the Replacement DIP Motion, the lenders (both the Initial DIP Lender and RA Capital Funding LLC, the "**Replacement DIP Lender**," together with the Initial DIP Lender, "**Lenders**") are over-encumbering all assets of the Debtors, even though the Debtors' have given no indication as to how they will meet their obligations beyond the DIP funding.

4.      The Debtors are hopelessly administratively insolvent, and there is no benefit to unsecured creditors by remaining in chapter 11 and continuing to incur costs. A Chapter 7 trustee is needed to wind down the businesses, liquidate assets, monetize assets such as intellectual property and web domains, pursue funds that the Debtors acknowledge have left the estates but for which repayment has never even been demanded, and continue the investigations begun by the Committee into the Debtors' principal and his enterprise of related entities and insiders. Cause clearly exists to convert these cases.

5.      Short of conversion, the Court should deny the Replacement DIP Motion's current form of interim order ("**Replacement Interim DIP Order**"). Along with the grounds stated in the Initial DIP Objection, the Committee is extremely concerned about various provisions in the proposed Replacement Interim DIP Order, as further indicated herein. The Replacement DIP Motion appears to ensure that unsecured creditors will be left penniless. Nothing in the record conceptually supports a distribution on account of unsecured creditors. The lien on avoidance

actions[3] and unwillingness to provide any significant runway in funding a Plan process makes it clear that the Lenders and the Debtors—directed by the principal—seek to maximize their own positions at the expense of all other parties.

6.      The Court should exercise its discretion and convert these cases to cases under Chapter 7 *sua sponte* and thereby deny the interim approval of the Replacement DIP Motion.

## **BACKGROUND**

7.      The history of these cases is well-known to this Court, and is relayed in multiple documents, including the Initial DIP Objection. For the sake of brevity, the Committee adopts the factual backgrounds in its previous docketed filings, and only raises new background information here.

8.      The Initial Interim DIP Orders (as defined in the Initial DIP Objection and inclusive of all interim DIP orders granted since the Initial DIP Objection) were intended to maintain the *status quo* regarding the initial DIP financing in these cases and to give the Debtors time to find replacement financing.

9.      On April 1, 2023, the Committee filed the Initial DIP Objection. The Court considered the Initial DIP Objection, including the Committee's conversion motion, and opted to allow the Debtors more time to secure replacement financing based, in part, on the Debtors' representation that they were close to closing with a replacement lender. That lender fell through, and it took an additional five months for the Debtors to propose, on shortened notice, a replacement DIP loan on September 11, 2024. During this time, the Debtors kept the Committee informed that

---

[3]     The Committee acknowledges the Debtors' footnote that the avoidance action lien is to be decided in a final order, which simply ensures more wasted time and effort—and more administrative fees—because the Committee now must negotiate over this provision after the motion was filed, and the Committee will be further disadvantaged and will incur more administrative expenses if it is forced to negotiate this provision after an interim order is entered.

negotiations were taking place, but the Committee was not included in negotiations, and was only provided near-final DIP-related documents days before the Replacement DIP Motion was filed. The Committee did not have an opportunity to provide comments to the documents.

## **ARGUMENT**

### I.     **These Cases Should be Converted to Cases Under Chapter 7**

10.     A bankruptcy court may convert a case from chapter 11 to chapter 7 upon motion of a party in interest or *sua sponte. See*, *e.g.*, *Lynch v. Vaccaro (In re Lynch)*, 795 Fed. Appx. 57, 59 (2d Cir. 2020) ("The bankruptcy court may convert to Chapter 7 upon the motion of a party in interest, 11 U.S.C. § 1112(b)(1), or sua sponte [as] necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." (internal citations omitted)). A diminution of the estate and an absence of a reasonable likelihood of rehabilitation provides cause to convert, and a full evidentiary hearing is not required.

11.     The court has "wide discretion to determine whether cause exists to . . . convert a case under § 1112(b)." *Hamilton Rd. Realty, LLC v. United States*, 2021 U.S. Dist. LEXIS 44486, *9 (E.D.N.Y. 2021) (*citing*, *Lynch v. Barnard*, 590 B.R. 30, 36 (E.D.N.Y. 2018), *aff'd sub nom. In re Lynch*, 795 F. App'x 57 (2d Cir. 2020)). Cause to convert to chapter 7 is typically established where, for example, there is diminution of the estate and an absence of a reasonable likelihood of rehabilitation. Bankruptcy Code § 1112(b)(4)(A).

12.     These and the other factors in section 1112(b) are not exhaustive—this Court has wide discretion to determine if cause exists. *See*, *In re Tornheim*, 181 B.R. 161, 1995 Bankr. LEXIS 653 (Bankr. S.D.N.Y. 1995). As long as the record before the court allows it to draw the necessary inferences to determine cause for conversion to chapter 7, due process is satisfied and a full evidentiary hearing is not required. *In re Lynch*, 795 F. App'x at 59 ("a full evidentiary hearing is not required as long as the record permits the bankruptcy court to draw the necessary inferences

to determine cause" for a Chapter 7 conversion) (internal quotations and citation omitted); *Sakon v. A&F Main St. Assocs., LLC*, 2021 U.S. Dist. LEXIS 9351, *27–28 (D. Conn. 2021) ("[D]ue process does not require a full evidentiary hearing before deciding a motion to convert if there is an adequate basis for the Bankruptcy Court to rule on."); *In re C-TC 9th Ave. Partnership*, 113 F.3d 1304, 1313 (2d Cir. 1997); *In re Sillerman*, 605 B.R. 631, 638 (Bankr. S.D.N.Y. 2019).

13.     The record before this Court is clear. In a year, the Debtors have not materially advanced these cases. No plan of reorganization has been proposed and attempt to monetize assets has been pursued. No attempt has been made to collect over $23 million in affiliate debt. No investigation by the Debtors into estates causes of action has been explored. Instead, the Debtors, their principal, and the Initial DIP Lender have spent a year treading water to get a deal that benefits Mr. Chaudhary, the Initial DIP Lender, and the Replacement DIP Lender, all at the expense of the creditors of these estates.

14.     The Debtors are hopelessly insolvent and would cease to operate but for the DIP financing. The Initial DIP Lender continued to accrue interest while being paid, meanwhile, the Debtors accrued substantial administrative costs—costs which must be paid if any plan of reorganization has a chance at being confirmed. Based on the meager carve-out and budget to date, the proposed budget going forward, and the substantial work performed and still remaining for both the Committee and the Debtors, it is unclear how these Debtors will ever be in position to fund a Plan. In fact, it is not clear whether the Debtors are not, under the current financing, falling further behind every month. At the September 4, 2024 status conference, the Initial DIP Lender represented that it loans based on accounts receivable, then is repaid once the AR is collected. What is not clear is whether excess funds sufficient to run the business, pay wages and taxes, fund

administrative and priority creditors, and provide for a meaningful distribution to unsecured creditors, even exist, or where they will come from.

15.     For the year while the Replacement DIP Lender was being located, the Initial DIP Lender was being paid and expenses accrued and further diminished what appear to be hopelessly insolvent estates. The Replacement DIP Lender finds itself in an even better position. The Replacement DIP Lender will not only be accruing interest under the Replacement DIP financing, but it will be doing so while being while being paid various fees under the Replacement DIP financing, all while also paying the Initial DIP Lender.

16.     A Chapter 7 trustee will be in a better position to continue the Committee's investigation into the insiders, affiliates, and others, and to pursue any claims that Debtors or the estates have against third parties, including insiders and affiliates of the Debtors, utilizing litigation funding or retaining counsel to work on a contingency fee basis. A trustee will also be better positioned to investigate the propriety of Initial DIP Lender's prepetition liens, and if appropriate, challenge those liens. Additionally, a trustee will be able to manage the costs to the estates by reducing the number of professionals involved in the process.

17.     The Court here should, *sua sponte*, convert these Chapter 11 cases to cases under Chapter 7 based on the record before it. At the September 4, 2024, status conference all parties met and discussed the current status of these cases and possible next steps. At that status conference, the Court noted the possibility these cases could convert, and expressed some concern over how to transition with as little harm as possible to the value of the estate assets.[4] The Committee shares the Court's concern, and Committee counsel stands willing to assist in the

---

[4]     Transcript of Status Conference of Matter of Elite Limousine Plus, Inc., Debtor Dated Sept. 4, 2024 (2024) (No. 23-4309-jmm) at 12:6-9 ("[W]e need to think 7 about how to transition the debtor, or I need to think about what I need to do to do as little harm as possible to the value of the debtors' assets.").

process as necessary to ensure a smooth transition. Clearly, preserving the estates' causes of action against third parties and not providing releases is an important step in preserving value.

18.     Should the Court determine, under section 1112(b), that it is in the best interest of creditors to dismiss, rather than convert, these cases, the Committee requests that such dismissal order be *status quo ante*, and not include any provisions that would limit, restrict, impair, or otherwise affect the rights of the various parties as the existed before the filing of these cases.

## II.     <u>The Replacement DIP Motion Must be Modified to Remove Objectionable Provisions</u>

19.     If the Court denies conversion at this stage of these cases, the Committee requests that the Court deny approval of the Replacement Interim DIP Order or require the Debtors to modify the order to address the Committee's concerns as described below.

### A.     <u>The Debtors Do Not Meet Requirements for a DIP or Adequate Protection.</u>

20.     For similar reasons as stated in the Initial DIP Objection, the Debtors cannot meet their burden to obtain DIP financing.

21.     Section 364 of the Bankruptcy Code provides the statutory basis for Debtors' request for approval of the proposed financing. *See*, 11 U.S.C. § 364. To obtain financing under sections 364(c) and (d), the Court must examine whether the Debtors have demonstrated, *inter alia*, that the terms are fair, reasonable, and adequate, in the Debtors' and estates' best interests, and that no alternative financing is available on better terms. *See*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 312–13 (Bankr. D. Del. 2011) ("In seeking approval of [DIP financing], the Debtors have the burden of proving that … the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender."); *In re Hubbard Power & Light*, 202 B.R. 680, 684–85 (Bankr. E.D.N.Y. 1996) ("The Debtor has the burden of proving that the requirements of [Section 364(d)] have been met") (*citing In re 495 Central Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992); *In re DB Capital Holdings, LLC*, 454 B.R. 804, 822

8

(Bankr. D. Colo. 2011) (court must determine that the proposed "financing is in the best interests of the estate and its creditors"); *In re Farmland Indus., Inc.*, 294 B.R. 855 (Bankr. W.D. Mo. 2003); *In re Au Natural Rest., Inc.*, 63 B.R. 575, 581 (Bankr. S.D.N.Y. 1986) (requirements under sections 364(c) and (d) include a showing that the debtor is unable to obtain credit "by some other, less drastic, means"); *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) ("The proposed financing is in the best interests of the general creditor body").

22.     The Debtors Schedules of Assets and Liabilities and Monthly Operating Reports still paint a confusing picture of the Debtors' finances, and there has been no investigation or clarification by the Debtors to address that the estates appear hopelessly insolvent.

23.     There is also a question of whether even cash collateral is sufficient to permit the Debtors to operate at current levels. According to the Debtors, they have established a track record of earnings in bankruptcy sufficient to continue operations, but then state that without the Replacement DIP financing they would be unable to operate. The Committee cannot to tell whether the obligation to the Initial DIP Lender is decreasing or growing as these cases continue to struggle week-over-week in chapter 11.

24.     Because both Lenders will be oversecured based on the schedules, but undersecured based on Debtors' statements regarding the affiliate receivables, the Committee cannot determine if the Lenders are entitled to or need to have adequate protection under sections 363 or 364 for the Debtors' use of their collateral. Or indeed, if adequate protection is required, why the use of cash under a budget (with necessary restrictions imposed on the Debtors) is not sufficient adequate protection.

25.     Moreover, the Committee submits that the chapter 11 process for the last year has benefitted only the Initial DIP Lender and Mr. Chaudhary. The constant delay of these cases has

caused not only compounding massive administrative expenses, but also has been the primary excuse of the Debtors' principal in failing to provide the consensual discovery he agreed to, thereby stalling the Committee's investigation into his assets (which might be recoverable by the estates for the benefit all creditors) and forcing the Committee to incur more fees to bring and prosecute a Rule 2004 motion. The Committee fears that the Replacement DIP financing will benefit only those parties (with the addition of the Replacement DIP Lender) as well. The Replacement DIP Financing includes many concessions to both the Lenders such as a lien on avoidance actions and their proceeds and a section 506(c) waiver.

26.     This has been exacerbated by underfunding of the estate professionals, thereby all but ensuring the Committee would not have adequate funds to fully investigate Initial DIP Lender's loan and pursue claims or causes of action as to Initial DIP Lender on behalf of the estates and handcuffing the Debtors' counsel to do very little to advance these cases apart from extending the DIP. Courts have held that "[a] bankruptcy court's discretion to authorize incentives to post-petition lenders is not unfettered." *Resolution Trust Co. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores)*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992). Since "[d]ebtors in possession generally enjoy little negotiating power with a proposed lender . . . lenders often exact favorable terms that harm the estate and creditors." *Id*. For this reason, post-petition financing should not be approved where it "convert[s] the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender" (*see*, *id.* at 317), or where the proposed terms would unduly leverage the chapter 11 process and prejudice the rights and powers the Bankruptcy Code confers for the benefit of all creditors. *See*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990); *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (proposed financing must not "pervert the reorganizational process from

one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the … Debtor's principals who guaranteed its debt.").

27.     The terms of the proposed financing are unfair to almost every interested party in these cases other than the Lenders and Mr. Chaudhary, making it highly unlikely that the Debtors can satisfy their burden of proof. They have failed to introduce sufficient evidence supporting the extraordinary terms, rights, and protections provided to the Lenders, and failed to show that such terms are fair, reasonable, and adequate and in the best interests of the Debtors and their estates. Rather, this is an instance where the Lenders seek to extract as many concessions as possible from Debtors, who, because of a disparity in bargaining leverage, have no choice but to accede to Lender's demands. Ultimately, the Replacement DIP Motion violates both the letter and spirit of section 364 of the Bankruptcy Code. Based upon the application of the legal standards and factual issues discussed above, the Replacement DIP financing should not be approved on an interim or final basis.

**B.  The Committee's Concerns Regarding the**
   **<u>Replacement DIP Financing on an Interim Basis.</u>**

28.     For similar reasons stated in the Initial DIP Objection and based on other the terms of the Replacement DIP Motion, the Committee believes interim relief should not be provided for the Replacement DIP Motion.

**i.     Initial DIP Lender Should Not Receive Releases Under the Interim Order**

29.     The Replacement Interim DIP Order contains provisions that release the Initial DIP Lender from all claims and causes of action that the estates may have against it, despite no adequate opportunity for investigation or review being conducted. Accordingly, until such opportunity for investigation has occurred, no releases should be granted to the Initial DIP Lender.

30.     Even if the Court chooses to grant certain releases to the Initial DIP Lender, the proposed Replacement Interim DIP Order should be modified to (i) acknowledgement statements made by the Debtors regarding the extent, validity, and nonavoidability of the debt and liens, and waivers of the Debtors' claims against Initial DIP Lender, and rights to investigate or challenge the extent and validity of the debt or liens, should not be binding on the Committee or any subsequent trustee or similar fiduciary, or (ii) limit releases of the Initial DIP Lender solely to their capacity as post-petition lender and with respect to claims or causes of actions regarding the DIP facility under all interim orders. All such claims should be preserved and the status quo maintained in the interest of the creditors and overall the Debtors' estates.

### ii.     Replacement DIP Lender Should Not Receive a Lien on Avoidance Actions, and Initial Lender Should Not Have Any Liens on Avoidance Actions Ratified

31.     The Replacement DIP Motion seeks to provide the Initial DIP Lender valid and perfected first-priority security interests and liens, superior to all other liens, claims, or security interests that any creditor of any of the Debtors' estates may have as to all causes of action the Debtors have, including avoidance actions, and the proceeds thereof through allowing approval of the Carve-Out and the Permitted Liens (as defined in the Intercreditor Agreement).[5] If the Court approves the Permitted Liens, the Initial DIP Lender and the Replacement DIP Lender will both have liens on all causes of actions the Debtors have, including avoidance actions, with the Replacement DIP Lender's liens having priority over the Initial DIP Lender's liens. These liens leave the creditors with essentially nothing given that any recovery scenario is likely to be through such actions, and all other assets, including those of the guarantor entities, are encumbered by the Lenders under the Replacement DIP Motion.

---

[5]     As noted above, the Replacement Interim DIP Order reserve the Avoidance Actions as subject to a Final Order for the Replacement DIP Lender's liens, but does not reserve such challenges as to Initial DIP Lender's liens.

32.    No lien on avoidance actions should be granted, as avoidance actions belong to the estates, not the Debtors. *See*, *Bethlehem Steel Corp. v. Moran Towing Corp. (In re Bethlehem Steel Corp.)*, 390 B.R. 784, 786 (Bankr. S.D.N.Y. 2008) ("Avoidance actions brought pursuant to the Bankruptcy Code never belonged to the Debtor, but rather were creditor claims . . . ."); *see also*, *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics, Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000) (concluding that avoidance actions are not property of the estate, but are essentially rights held by the estate for the benefit of creditors); *In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989) ("The avoiding powers are not 'property' but a statutorily created power to recover property."); 5 Collier on Bankruptcy ¶ 541.14 at n.1 (same).

33.    The purpose of avoidance actions is to allow recoveries to be made for the benefit of unsecured creditors. *See*, *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) (*citing Wyle v. C.H. Rider & Fam. (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir.1991)) ("the purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors"); *In re Cybergenics Corp.*, 226 F.3d 237, 243–45 (3d Cir. 2000) (avoidance actions are meant to fulfill the "obligation[] to maximize the bankruptcy estate for the benefit of creditors" and not to "benefit . . . the debtors themselves"; and "the fraudulent transfer claims, which state law provided to [the debtors'] creditors, were never assets of [the debtor] … [T]he avoidance power itself . . . was likewise not an asset of [the debtor]"); *In re Sweetwater*, 55 B.R. 724, 735 (D. Utah 1985) (avoiding powers are meant to benefit creditors generally and promote equitable distribution among all creditors).

34.    In the Replacement DIP Motion, the Debtors provide both the Lenders with a lien on these statutorily-created causes of action belonging to the estates. To allow the Debtors to use

their powers to effectively assign the benefits of estate claims and proceeds thereof to the Lenders, as opposed to and for the benefit of unsecured creditors, turns federal bankruptcy law on its head. Permitting a lien or a claim against the avoidance actions and other litigation claims and proceeds would be inequitable and serve to remove one of the few avenues unsecured creditors may have to obtain a recovery from these estates. Unsecured creditors should not be divested of what may be their only source of recovery in these cases. The Committee therefore requests that neither the proposed Replacement Interim DIP Order nor any final DIP order include liens on avoidance actions and their proceeds.

### iii.    The Initial Lender Should Not Receive a Lien on Certain Claims or Against Insurance Proceeds

35.    As with the lien on avoidance actions, the proposed Replacement Interim DIP Order purports to finalize the Initial DIP Lender's lien on claims against officers, directors, and equity holders of the Debtors, affiliates of the Debtors, and any applicable insurance policies.

36.    Until the Committee has had an opportunity to investigate the propriety of such liens and determine if there is value that may be recovered for the benefit of unsecured creditors neither the Initial DIP Lender or the Replacement DIP Lender should be granted such liens in an interim order.

37.    Accordingly, paragraph 2.1(b) of the proposed Replacement Interim DIP Order should be removed and the Intercreditor Agreement (as defined in the Replacement DIP Motion) should be modified to remove such liens.

### iv.    The Lenders Payment Should Be Subject to Disgorgement or Recharacterization

38.    All payments to the Lenders should be provisional and non-final and should be subject to disgorgement or recharacterization.

39.     The payments, including all fees and expenses of, and any other adequate protection payments to, both Lenders should be subject to review and recharacterization and/or disgorgement in the event of a successful challenge, or in the event the Court determines that the Lenders are not entitled to such payments. Similarly, any fees and expenses must be subject to appropriate remedies in the event of a successfully challenge. Limiting the Committee's options to recover such amounts for the benefit of the creditors is inappropriate under the circumstances, including when recoveries for unsecured creditors are unknown.

40.     Accordingly, paragraph 1.4(a) of the proposed Replacement Interim DIP Order should be removed.

### v.     The Initial Lender's Creeping Roll-Up Should Not Be Finalized

41.     The proposed Replacement Interim DIP Order purports to finalize the Initial DIP Lender's financing, including the inclusion of the creeping roll-up payments since the first interim order related to the Initial DIP financing, however the propriety of the creeping roll-up is still questionable given the reasons more fully described in the Committee's Initial DIP Objection.

### vi.     The Replacement DIP Motion Contains an Inadequate Estate Professional Carve-Out

42.     Courts have recognized that carve-outs are a necessary component of maintaining the balance of power between debtors and creditors in chapter 11 cases. *See*, *In re Ames Department Stores, Inc*., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990); *In re Rite Indus.*, 2000 Bankr. LEXIS 2116, at *13–14 (Bankr. M.D.N.C. 2000).

43.     Although there is a proposed budget in the Replacement DIP Motion, there is no specific carve-out for Committee professionals. Notwithstanding that the Lenders may benefit from any recoveries the Committee could obtain through its investigations. The fact there is nothing specifically allocated to the Committee's professionals is unacceptable and designed to

inhibit the Creditors from being adequately represented in these cases. Additionally, even if the section of the budget designated to legal professional fees is inclusive of the Committee's professionals, $30,000 per month for both the Committee's and the Debtors' professionals is wholly inadequate. It is not clear the disparity between the Debtors' and Committee's amounts, and if disparate, there is no detailed explanation for this disparate treatment as required by Local Bankruptcy Rules 4001–5(d)(i).

44.    Typically, the increased amount allocated to the budget for debtor professionals is in recognition of the most time-consuming aspects of a chapter 11 case, such as the crafting and negotiation of a plan of reorganization or the sale of substantially all assets of the debtor, or both. These are what a debtor works toward from the moment a typical chapter 11 is filed. By contrast, here, over the course of a year, the Debtors' professionals have neither explored a sale of any asset nor investigated where estates assets could be recovered to help fund a Plan, let alone take any steps to propose a Plan. Until a Plan is set forth, there is no clear concept as to what a restructuring looks like for these Debtors and all that has been accomplished has been for the benefit of the Lenders. There has been no benefit for the estates or unsecured creditors.

45.    As a consequence, the Committee started to investigate sources of potential value for possible recovery for the estates. As a result, the Committee's professionals have needed to analyze many items that the other parties handled (and were paid to handle) over the preceding weeks, in addition to many more items the Debtors' have not investigated. Fulfilling this obligation requires funding, and though the Committee's professionals have not yet filed fee applications, the time spent amounts to significant accrued fees.

46.    The lack of a carve-out is both unacceptable to the Committee and abhorrent to the goals of the Bankruptcy Code, which presupposes that estate fiduciaries will be able to discharge

the duties imposed upon them by law. *See*, *In re Ames Department Stores, Inc.*, 115 B.R. at 38 ("[I]t has been the uniform practice in this court . . . to insist on a carve out from a superpriority status and post-petition lien in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system. Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced."); *In re Twenty Six Realty Assoc.*, No. 95 CV 1262, 1995 WL 170124 (E.D.N.Y. April 4, 1995) ("carve-out provisions are commonly relied upon to ensure the debtor's ability to be represented in the adversarial proceedings during the pendency of its bankruptcy"); *In re Cottrell Int'l, LLC*, No. 00-13592, 2000 Bankr. Lexis 1093, at *9 (Bankr. D. Col. 2000) (bankruptcy courts should not unduly restrict the availability of funds to pay other professionals in the case, including counsel for the creditors committee). The lack of a carve-out here effectively chills the Committee's further involvement in these cases through its professionals, since the administrative solvency of the Debtors is far from assured.

47.     Professionals should not be required to finance a debtor's bankruptcy proceeding. If the Debtors and the Lenders want the benefits they can obtain only through chapter 11, they must acknowledge that chapter 11 is a collectivist process and intended to promote the good of all creditors. It is not for the exclusive benefit of a secured creditor or DIP lenders.

48.     For a chapter 11 case to be administered and handled properly, statutory fiduciaries must be represented by qualified professionals. Thus, the actions of the Committee professionals should not be dictated by the Lenders, but rather by the duties imposed upon the Committee and its professionals. It is imperative for the integrity of the bankruptcy process that the Committee's professionals are permitted to advocate on behalf of unsecured creditors without being subject to the control of outside third parties whose interests are adverse to those of the estate. If the Debtors

and the Lenders cannot or choose not to pay for the process of chapter 11, then these cases should not be in chapter 11 but rather dismissed to allow the parties to proceed to enforce any rights they have state court, each at their own cost.

49.      The Committee professionals seek reasonable compensation, the allowance of which will ultimately be decided by the Court. This Court, in the exercise of its discretion and to ensure that the relief granted is in furtherance of the principles of the Bankruptcy Code, should not approve a final order unless it includes the funding of an appropriate and reasonable carve-out so the estate fiduciaries are permitted to do their jobs properly.

### vii.      The Replacement DIP Facility Inappropriately Limits the Committee

50.      The Committee has a fiduciary duty to investigate, *inter alia*, the Debtors, their assets, liabilities, and financial affairs, including the amount of the Initial DIP financing and the Replacement DIP financing and the validity and extent of the liens securing it. The proposed Replacement Interim DIP Order imposes significant roadblocks to the Committee's ability to fulfill its fiduciary duty.

51.      Under the Replacement DIP Interim Order, no funds from the financing can be used to pay any challenges to any DIP financing:

- an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (a) challenging the legality, validity, priority, perfection, or enforceability of the Post-Petition Obligations or the Replacement DIP Lender's liens on and security interests in the Collateral; (b) invalidating, setting aside, avoiding or subordinating, in whole or in part the Post-Petition Obligations or the Replacement DIP Lender's liens on and security interests in the Collateral; or (c) preventing, hindering or delaying the Replacement DIP Lender's assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of this Interim Order and the Replacement DIP Loan Agreement;

- the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against the Replacement DIP Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, predecessors,

successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the Replacement DIP Lender under chapter 5 of the Bankruptcy Code;

- the cost of investigation into any claims against the Replacement DIP Lender arising under or in connection with the Replacement DIP Loan Agreement in excess of $10,000; or

- any act which has or could directly, materially and adversely modify or compromise the rights and remedies of the Replacement DIP Lender under this Interim Order, or which directly results in the occurrence of a Default under this Interim Order or the Replacement DIP Loan Agreement.

Replacement DIP Interim Order ¶2.3(d).

52.     If the Court grants the Replacement DIP Motion, the Committee requests the Court remove or modify paragraph 2.3(d) to exclude the Committee from these restrictions.

### viii.     New Lender Should Not Receive a Collateral Management Fees and Consultant Requirements Should be Modified

53.     The proposed Replacement Interim DIP Order grants the Replacement DIP Lender payment for management and consulting fees for work it is requiring the Debtors' financial advisor to do given the terms in the Replacement DIP. Under section 8.2 of the Replacement DIP agreement, the Consultant, as defined in the Replacement DIP Motion as the Debtors current financial advisor Altman and Company LLC, is required to (a) deliver to the Replacement DIP Lender copies of all budgets, records, projections, financial information, reports and other information prepared, produced and/or delivered by or to the Consultant with respect to the Collateral or the financial condition, business or operation of the Debtors and (b) cause the Consultant to consult with the Replacement DIP Lender on a regular basis as requested by Replacement DIP Lender, and if requested by the Replacement DIP Lender. While the Committee understands the need for the Replacement DIP Lender to monitor the Debtors books and records, given the insolvency of the estates based on administrative expenses alone, the Committee asks that financial reporting be limited to those required by the Bankruptcy Code.

54.     Additionally, although the Committee agrees that the Debtors' principal should not manage the Debtors' businesses, it is inappropriate for the Replacement DIP Lender to step into that role or to be paid from the Replacement DIP funds, especially given the insufficient budget proposed for legal professionals of this case (described above). Accordingly, paragraph 1.4(b) of the proposed Replacement Interim DIP Order should be modified to exclude the collateral management fee payment and revised to limit the Replacement DIP Lender's requirements for the Consultant.

### ix.    Replacement DIP Events of Default Should be Modified

55.     If the Court grants the Replacement DIP Motion, the Committee requests the Court modify Events of Default under the Replacement DIP Credit Agreement to remove those events that allow the Replacement DIP Lenders to stop funding these cases if (a) the Debtors cease business operations for the benefit of the estates; (b) the aggregate of any judgements or orders for the payment of money entered against the Debtors after the Petition Date exceeds $1,000 under causes of action granted under the Bankruptcy Code; (c) there are successful challenges to the Replacement DIP Lender's liens; (d) a trustee is appointed for the Debtors; and (e) the cases are converted to a chapter 7 case under the Bankruptcy Code.

56.     These events of default eviscerate many of the ability creditors could request the Court to grant under the Bankruptcy Code. Transparency, Committee oversight, and the ability for a trustee to take over a case if debtors are not acting appropriately are hallmarks of chapter 11 and these events of default take away those key aspects of the Bankruptcy Code.

57.     The Replacement DIP Lender should not be allowed to weaponize the Replacement DIP financing with heavy-handed Events of Default to avoid meaningful investigation and challenges that could benefit the estates while simultaneously reaping all the benefits of chapter

11 and getting paid fees on top those benefits. Additionally, given the record of these cases, it is well-known to the Replacement DIP Lender that there is a high possibility of the Debtors ceasing operation or being converted to chapter 7.

58.     Thus, the Replacement DIP Lender should not be able to use such events of default to further benefit from the process as it awaits a possible conversation. These certain events of default in section 9.1 must be modified or made unapplicable for the interim period until a decision can be made on a final basis.

### x.     The Lenders are Not Entitled to 506(c) and 552 Waivers

59.     The proposed Replacement Interim DIP Order impermissibly contains a waiver by the estates of their rights to surcharge both Lenders' collateral under section 506(c) of the Bankruptcy Code, and a waiver of the rights provided under section 552. The decision of the United States Supreme Court in *Hartford Underwriters Inc. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000), makes clear such waivers, since binding on all parties, should not be lightly granted and management of a debtor should not make such a waiver except for compelling reasons.

60.     Even if 506(c) waivers were not disfavored, such a waiver is not appropriate under the circumstances here. The Lenders should not be permitted to use this Court as a forum to liquidate its collateral for its own benefit while at the same time thrusting the entire cost of liquidation upon the Debtors' estates and unsecured creditors. Accordingly, a waiver of 506(c) rights is unwarranted and should be deleted from the Replacement Interim DIP Order. *See*, *e.g.*, *In re Colad Group, Inc*., 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve postpetition financing agreement to the extent that the agreement purported to modify statutory rights and obligations created by the Bankruptcy Code prohibiting any surcharge of collateral under 506(c)), followed by *In re Dana Corp.*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006); *In re Ridgeline Structures,*

*Inc.*, 154 B.R. 831, 832 (Bankr. D.N.H. 1993) (declining to approve a 506(c) waiver in cash collateral stipulation); *In re Willingham Inv., Inc.*, 203 B.R. 75, 79 (Bankr. M.D. Tenn. 1996) (declining to include a 506(c) waiver in order approving cash collateral).

61.     If this Court were to approve the abrogation of 506(c) rights, all parties-in-interest, including any subsequently appointed trustee, could lose this valuable Bankruptcy Code protection, which would be detrimental to the estates and their creditors. If this Court determines to approve such waivers, they should terminate upon the occurrence or an Event of Default under the Replacement DIP Financing.

62.     Alternatively, if this Court is unwilling to strike the 506(c) and 552 waivers, the Committee should, in the Replacement Interim DIP Order, be explicitly vested with standing to seek a surcharge against the collateral or to protect the proceeds of avoidance actions or after-acquired property based on the equities of the cases if the facts ultimately prove that such remedies are appropriate and vested with the Committee or its successor. Providing the Committee with standing to pursue such remedies, if appropriate, will preserve assets of the estates for the benefit of all unsecured creditors.

63.     Accordingly, sections 4.3 and 5.8 of the proposed Replacement Interim DIP Order should either be removed to exclude the 506(c) and 522 waivers or modified as requested above.

   **xi.     The Committee Should Receive Financial Updates**

64.     The Committee requests that any interim order include a provision that the Committee should receive any ongoing financial updates and copies of any reports the Replacement DIP Lender receives, as that required in section 7.1(k) of the Replacement DIP.

65.     Additionally, the Committee should receive notice of any amendment to the Replacement DIP documents. Accordingly, paragraph 1.4(b) of the proposed Replacement Interim DIP Order should be modified to include the Committee.

## <u>CONCLUSION</u>

**WHEREFORE**, for all the reasons set forth herein, the Committee respectfully requests that the Court determine *sua sponte* that these cases should convert to cases under Chapter 7; or in the alternative, the Court deny approval of the Replacement DIP Motion on an interim basis; and grant such other relief as the Court deems just and proper.

Dated:   New York, New York
September 16, 2024

MORRISON COHEN LLP
Counsel for the Official
Committee of Unsecured Creditors


By: */s/ David J. Kozlowski*
   Joseph T. Moldovan
   David J. Kozlowski
   Dawn R. Sudama
   909 Third Avenue
   New York, New York 10022
   (212) 735-8600
   jmoldovan@morrisoncohen.com
   dkozlowski@morrisoncohen.com
   dsudama@morrisoncohen.com